FILED'07 SEP 10 13:55 USDC·ORM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

KLAMATH SISKYOU WILDLANDS                )
CENTER, et al.,                          )
                                         )
                                         )    Civ. No. 06-3076-PA
              Plaintiffs,                )
                                         )    **ORDER**
       v.                                )
                                         )
BUREAU OF LAND MANAGEMENT,               )
an agency of the U.S.                    )
Department of Interior,                  )
                                         )
              Defendant.                 )
_____

**PANNER, Judge:**

Plaintiffs Klamath Siskiyou Wildlands Center, Siskiyou
Regional Education Project, and Oregon Wild bring this action for
declaratory and injunctive relief under the Administrative
Procedures Act (APA), 5 U.S.C. §§ 701-706, against defendant
Bureau of Land Management (BLM).  Plaintiffs, claiming that the
BLM violated the National Environmental Policy Act (NEPA), 42

1  - ORDER

U.S.C. §§ 4321-4370f, seek to enjoin the Pickett Snake and
Pickett Charge timber sales, which are in the Rogue-Recreation
Watershed of the  BLM's Medford District.

The parties move for summary judgment.  I grant defendant's
motion and deny plaintiffs' motion.

**BACKGROUND**

**I.  Administrative and Procedural Background**

The Pickett Snake Landscape Management Project is intended
to meet the objectives of the Medford District's Resource
Management Plan and the Northwest Forest Plan.  The objectives of
the Resource Management Plan include reducing fire hazard,
promoting wildlife habitat, maintaining or improving water
quality, harvesting timber, thinning forest stands, and providing
recreation.  The BLM proposed the Pickett Snake and Pickett
Charge timber sales as part of the Pickett Snake Landscape
Management Project.

In 1999, the BLM published an Environmental Assessment for
the Pickett Snake Landscape Management Project.  The
Environmental Assessment examined the entire Project, including
the timber sales at issue here, with a no-action alternative and
two alternatives that included logging.

The BLM consulted with the U.S. Fish and Wildlife Service
about the potential effects of the timber sales on the northern
spotted owl.  The Fish and Wildlife Service's biological opinion
found that the proposed timber sales would not jeopardize the

northern spotted owl or harm its critical habitat.   In June 2002, the BLM issued a Decision Record and Finding of No Significant Impact (DR/FONSI) for the Pickett Snake Landscape Management Project.

Plaintiffs administratively appealed the 2002 DR/FONSI and the Environmental Assessment.   The BLM awarded the Pickett Snake timber sale in January 2003.   Later that month, plaintiffs filed an action in this court, seeking to enjoin the Pickett Snake timber sale.   <u>Klamath Siskiyou Wildlands Center v. BLM</u>, Civ. No. 03-3006-CO (D. Or.) (<u>Pickett Snake I</u>).

In <u>Pickett Snake I</u>, this court enjoined the BLM from awarding the Pickett Snake timber sale, while also ruling that the BLM complied with NEPA by taking a hard look at the cumulative impacts of the Pickett Snake Landscape Management Project on wildlife, the watershed, and the northern spotted owl in particular.   In November 2004, this court entered a stipulated judgment, which provided that

(1) the BLM failed to document whether it used the visual contrast rating system to determine the Pickett Snake Landscape Management Project's compliance with the visual resources management objectives of the Medford District Resource Management Plan, and this failure violated the Federal Land Policy and Management Act's requirement that projects comply with Resource Management Plans;

(2) the BLM did not adequately explain why it rejected the alternative of deferred harvest suggested by the interdisciplinary team's wildlife biologist, and this failure violated NEPA's requirement that agencies consider a reasonable range of alternatives in analyzing environmental effects of proposed actions; and

(3) the BLM did not analyze the cumulative impact of other projects being conducted or considered within the same watershed in making the cumulative impact analysis of the Pickett Snake Landscape Management Project, and this failure violated NEPA's requirement that agencies consider cumulative impacts.

This court enjoined the BLM from awarding the Pickett Snake timber sale contract until the BLM addressed the deficiencies in its analysis of environmental effects.

On remand from this court's judgment in Pickett Snake I, the BLM issued a Supplemental Environmental Assessment for the entire Pickett Snake Landscape Management Project; an addendum to the Environmental Assessment that specifically addressed the Pickett Charge timber sale; and Decision Records/Findings of No Significant Impact (DRs/FONSIs) on each sale.

In 2004, the U.S. Fish and Wildlife Service found that the West Coast population of the fisher, a mink-like animal, met the criteria for listing as an endangered species, although listing was precluded by species with higher priorities.  69 Fed. Reg. 18770-18792 (U.S. Fish and Wildlife Serv. April 8, 2004)

4  - ORDER

(12-month finding on petition to list West Coast population of
the fisher (*Martes pennanti*)).  The Pacific fisher prefers old-
growth forest habitat similar to that preferred by the northern
spotted owl.

The BLM denied plaintiffs' administrative appeals of the
Pickett Snake and Pickett Charge timber sales.  The BLM rejected
plaintiffs' request for a stay, ruling that the Fish and Wildlife
Service's decision on the fisher's status was not new and
significant information that would warrant a supplemental
environmental assessment.

Plaintiffs then filed this action for judicial review.

**B.    The Two Timber Sales and the Pacific Fisher**

"To ensure that national forest timber sales would comply
with legal conservation requirements, the [Northwest Forest Plan]
divided the approximately 24.5 million acres of federal land
within the northern spotted owl's range into several hierarchical
allocations designated by the type of land use in each
allocation."  Oregon Natural Resources Council Fund v. Brong, 492
F.3d 1120, 1126 (9th Cir. 2007) (Brong) (citation omitted).
While six of the allocations are reserve areas in which logging
is generally prohibited, the remaining unreserved areas are
designated as "Matrix" land, "in which timber harvest may go
forward subject to environmental requirements."  Id.

All of the logging authorized by the two timber sales here
would occur only on Matrix land.  Under Resource Management Plan,

Matrix areas are to provide a sustainable supply of timber to support jobs. The timber sales here are also intended to further the objectives of restoring healthy forests and reducing the risk of fire. It is important to note that neither timber sale would allow logging on land classified by the Northwest Forest Plan as Late-Successional Reserve. "'The objective of Late-Successional Reserves is to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth related species including the northern spotted owl.'" Brong, 492 F.3d at 1126 (quoting Northwest Forest Plan Standards and Guidelines at C-9).

The Pickett Snake timber sale would allow logging on 1,116 acres, while the Picket Charge timber sale would allow logging on 337 acres.[1] The BLM has reduced the area originally set aside for logging in the 1999 Pickett Snake Environmental Assessment by about 3,000 acres. See R. at 470.

The Pickett Snake timber sale includes 46 acres of structural retention harvest and 1070 acres of commercial thin, modified group selections. The Pickett Charge timber sale includes 129 acres of structural retention harvest and 223 acres of commercial thin, modified group selections.

---

[1]    The Prospectus for the Pickett Charge timber sale states that the cutting area is 337 acres. R. at 249; Defts. Op. Brief at 5. However, Addendum 2 to the Pickett Snake Environmental Assessment states that Pickett Snake timber sale includes 352 "total harvest acres." R. at 470.

Structural retention harvest is intended either to increase the productivity of existing understory trees, or to regenerate a new understory with the help of tree planting.  Stands with an overstory more than 120 years' old, and with a poor annual stand growth rate, are harvested.  Between 16 to 35 large conifer trees per acre are retained, while trees greater 6" DBH are removed.

Commercial thinning/modified group selection is intended to retain a healthy conifer overstory.  The process decreases stand density; removes merchantable-size trees, 4" DBH or more, that have slowed in growth; and removes trees that are competing with vigorous pines, or are growing around selected hardwood trees.

At oral argument on the parties' motions, counsel for the BLM stated that the U.S. Fish and Wildlife Service has withdrawn the Biological Opinion underlying the Pickett Charge timber sale. The Pickett Charge timber sale will not be awarded until a new Biological Opinion is issued.

In May 2007, to comply with <u>Oregon Natural Resources Council v. Allen</u>, 476 F.3d 1031 (9th Cir. 2007), the U.S. Fish and Wildlife Service withdrew the Biological Opinion underlying the Pickett Snake timber sale as to the northern spotted owl and its critical habitat.  Until the Fish and Wildlife Service completes consultation with the BLM, the Pickett Snake timber sale contract will be suspended, and no logging or other project activities will occur.

## STANDARDS

Judicial review of an agency's action is governed by the Administrative Procedures Act.  The court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(a)(2).  Before a court may overturn an agency decision under this standard,

> the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971) (citations omitted).  This standard applies to an agency's interpretation of its own regulations, particularly when scientific methods are at issue.  Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1376 (9th Cir. 1998) (citations omitted).  "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."'"  Friends of the Wild Swan, Inc. v. U.S. Fish & Wildlife Serv., 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (further citations omitted)).

8  - ORDER

Although the parties have filed cross-motions for summary judgment, the legal standards for summary judgment motions do not apply to the judicial review of an agency decision.  Because judicial review of agency decisions under the APA is generally limited to the administrative record, no material facts are in dispute.  Maine v. Norton, 257 F. Supp. 2d 357, 363 (D. Me. 2003).  The label placed on the parties' motions does not change this court's standards for reviewing an agency decision.

**DISCUSSION**

Plaintiffs claim that the BLM violated NEPA by (1) failing to consider a reasonable range of alternatives, including the no-action alternative; and (2) failing to consider significant new information concerning the Pacific fisher.

## I.   The BLM Adequately Explained Its Consideration of the No-Action Option

### A.   Background

In his Findings and Recommendation (F&R), Magistrate Judge Cooney stated that the Environmental Assessment was invalid because "the defendant failed to explain why [the proposed alternative of deferring logging in section 21 of the Project area] was rejected and it appears that this was a reasonable alternative which should have been considered."  F&R at 42.  Plaintiffs contend that the BLM's Supplemental Environmental Assessment, issued on remand, does not adequately explain the BLM's failure to adopt the deferral of harvest option suggested by the wildlife biologist.

In the Supplemental Environmental Assessment, the BLM stated
that it need not revisit the deferral of harvest option because
it already considered that option.  The BLM states that the
wildlife biologist who had expressed concerns about the effects
of logging then helped to draft the third alternative to
incorporate his concerns.  The Supplemental Environmental
Assessment states:

> The EA presented two action alternatives for "Stand
> harvest treatments in older seral stages".  Alternative
> 2 focused on stand treatments that would increase stand
> health and tree growth.  The objective for Alternative
> 3 was to "maintain a greater level of late-successional
> forest in the project area" than Alternative 2, and "to
> manage *more* acres for habitat and connectivity of late-
> successional forest dependent species."  Alternative 3
> proposed lighter harvest treatments on 580 acres with
> the goal of maintaining 50+% canopy closure in these
> stands.
>
> The interdisciplinary team (IDT) developed
> Alternative 3 due to a concern about the potential
> impacts of Alternative 2 on late-successional forest
> habitat and the wildlife biologist's suggestion to
> defer harvest in Section 21.  As a result, Alternative
> 3 was designed to have less impact on 580 acres of the
> best, most strategically located late-successional
> habitat than Alternative 2 while at the same time
> meeting the project's purpose of providing timber,
> creating more vigorous and sustainable stands, and
> maintaining late-successional forest habitat.
>
> Alternative 3 was developed prior to delineation
> of Survey & Manage (S&M) species buffers on the ground.
> These buffers proved to have an unusually high
> concentration throughout much of Section 21 due
> primarily to an abundance of red tree vole sites.
> Consequently, the majority of Section 21 was excluded
> from the Picket Snake timber sale under alternatives 2
> and 3.  In effect, both action alternatives essentially
> adopted the wildlife biologist's initial suggestion to
> defer harvest in Section 21.  Only 40-45 acres around
> the perimeter of Section 21 were carried forward into
> the Pickett Snake timber sale.  The high density of S&M

buffers in Section 21 was noted in the Decision Record
(DR), which points out that the objective of
Alternative 3 for older seral stage stands was
essentially met even with the final selection of
Alternative 2 for implementation.

R. at 500.

### B.  Discussion

"Informed and meaningful consideration of alternatives,
including a no-action alternative, is central to the NEPA
statutory scheme." Oregon Natural Resources Council Action v.
U.S. Forest Serv., 445 F. Supp. 2d 1211, 1223 (D. Or. 2006)
(citation omitted) (ONRC Action).  "[C]ompliance with NEPA
dictate[s] that the agency thoroughly consider alternatives in
light of the combined effects on survey and manage species
together with other environmental impacts the agency has
identified." Id. at 1224.

Here, the BLM has adequately explained its treatment of the
no-action alternative.  The Supplemental Environmental Assessment
fulfills the BLM's duty on remand by showing that the BLM
considered all reasonable options.  NEPA does not require that an
agency issue a lengthy supplemental environmental assessment on
remand if a relatively brief discussion will suffice.

Plaintiffs contend that the BLM on remand simply
rationalized its previous decision rather than reevaluating the
deferral option in light of this court's order.  I agree with the
BLM, however, that it has fulfilled its obligation on remand.
The BLM is entitled to judgment on plaintiffs' first claim.

**II.  Did the BLM Violate NEPA by Failing to Address the Listing
of the Pacific Fisher?**

   **A.  Plaintiffs Did Not Waive Their Right to Pursue the
Fisher Claim**

   The BLM argues that plaintiffs failed to bring the 2004
listing of the Pacific fisher to the agency's attention during
the public comment process, and that plaintiffs are therefore
barred from seeking judicial review of the issue.

   The APA requires that plaintiffs exhaust their
administrative remedies before seeking review in federal court.
Great Basin Mine Watch v. Hankins, 456 F.3d 955, 965 (9th Cir.
2006) (citing 5 U.S.C. § 704).  Plaintiffs exhaust their
administrative appeals "if the appeal, taken as a whole, provided
sufficient notice to the [agency] to afford it the opportunity to
rectify the violations that the plaintiffs alleged."  Id.
(citation and quotation marks omitted).

   A federal agency's responsibility to comply with NEPA
"'should not depend on the vigilance and limited resources of
environmental plaintiffs.'"  Friends of the Clearwater v.
Dombeck, 222 F.3d 552, 559 (9th Cir. 2000) (quoting City of Davis
v. Coleman, 521 F.2d 661, 667 (9th Cir. 1975)).  "It is the
agency, not an environmental plaintiff, that has a 'continuing
duty to gather and evaluate new information relevant to the
environmental impact of its actions,' even after release of an
EIS."  Id. (quoting Warm Springs Dam Task Force v. Gribble, 621
F.2d 1017, 1023 (9th Cir. 1980)).  Here, regardless of whether

plaintiffs raised the fisher issue during the agency proceedings, the BLM did address the issue on the merits. Plaintiffs are not precluded from raising the issue on judicial review.

## B. The BLM's Consideration of the 2004 Fisher Listing

Plaintiffs contend that the BLM violated NEPA by deciding that the 2004 listing of the Pacific fisher was not significant. The BLM responds that it correctly determined that the two timber sales will not significantly reduce fisher habitat.

### 1. Background

Because Pacific fishers avoid open areas, past logging practices such as clear cutting and removing snags and debris contributed to the decline of the fisher population. The Northwest Forest Plan generally avoids these harvesting methods to conserve species that live in late-successional and old-growth forest, such as the fisher and the northern spotted owl. See Brong, 492 F.3d at 1126. Using the northern spotted owl as a surrogate for the Pacific fisher in its analysis, the U.S. Fish and Wildlife Service found that the Northwest Forest Plan would substantially improve habitat for the fisher. The Fish and Wildlife Service concluded that threats to the fisher are not imminent, and that the greatest long-term risk to the Pacific fisher stemmed from the isolation of small populations.

There has been only one recorded sighting of a fisher in the Rogue River watershed during the last 11 years. Plaintiffs argue that the Project area includes habitat suitable for fishers, but

13 - ORDER

plaintiffs have not pointed to evidence that any fishers actually live in the Project area.  The BLM determined that only about 400 acres of suitable fisher habitat falls within the harvest areas of the two sales.  Suitable fisher habitat exists on almost 2,000 acres within the Pickett Snake Landscape Management Project area, as well as another 8,500 acres in the Rogue River watershed.  See Defs. Op. Br. at 22.

### 2. Discussion

"Once an agency has prepared an EA and issued a FONSI, an agency must supplement its analysis if there are 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'  There is an obligation to supplement an EA if there remains major federal action to occur and the new information shows that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered."  ONRC Action, 445 F. Supp. 2d at 1219 (quoting 40 C.F.R. § 1502.9(c)(1)(ii); citations omitted).

Plaintiffs cite Sierra Club v. Bosworth, 465 F. Supp. 2d 931 (N.D. Cal. 2006), in which the district court held that the Forest Service violated NEPA by failing to take a hard look at the impact of logging on the southern Sierra fisher.  In Bosworth, the court cited the 2004 listing of the fisher, but it also relied on the southern Sierra fisher's status as a genetically distinct species in danger of extirpation, and on the

government's admission that as many as 23 out of a possible 50 remaining female fishers might be affected by the proposed logging.  465 F. Supp. 2d at 940.

Here, unlike <u>Bosworth</u>, there have been no fishers sighted in the project area.  The BLM has already addressed fisher habitat by examining the impact of the Project on northern spotted owl habitat, and it is not required to issue another supplemental Environmental Assessment to address the impact of the timber sales on a species that may not be present in the affected area. It is within the BLM's discretion to use northern spotted owl habitat as a surrogate for fisher habitat.  The BLM reasonably concluded that the 2004 listing of the fisher did not require additional analysis.  The BLM is entitled to judgment on plaintiffs' second claim.

**CONCLUSION**

Plaintiffs' motion for summary judgment (#23) is denied. Defendant's motion for summary judgment (#28) is granted.  Any other pending motions are denied as moot.

DATED this ___10___ day of September, 2007.

OWEN M. PANNER
U.S. DISTRICT JUDGE

15 - ORDER